UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:06CR- |
| | : | |
| v. | : | **VIOLATIONS**: |
| | : | 18 U.S.C. § 371: [Conspiracy]; |
| DMITRY KUPERMAN | : | 15 U.S.C. §§ 77q(a), 77x: [Securities Fraud]; |
| a/k/a James Kaufman | : | 18 U.S.C. § 2: [Aiding and Abetting]; |
| a/k/a Jimmy Kaufman | : | 28 U.S.C. § 2461 and |
| | : | 18 U.S.C. §§ 981 [Forfeiture]. |

**INFORMATION**

The United States Attorney Charges:

**COUNT ONE**
**(18 U.S.C. § 371)**
**Conspiracy to Commit Mail Fraud,**
**Securities Fraud, and Money Laundering**

**Introduction**

At all times relevant to this Information:

1.      Defendant DMITRY KUPERMAN ("KUPERMAN"), also known as James Kaufman and as Jimmy Kaufman,  resided in the State of New York and worked at Blue Square Management, Inc.

2.      Viktor Novosselov, who is not a defendant herein, also known as "David Markowitz" and as "Viktor Novoseloff" ("Novosselov"), resided in the State of New York, and conducted financial transactions through various accounts including business accounts in the name of Blue Square Management, Inc. and personal accounts in the name of David Markowitz.

3.      Igor Malyar, who is not a defendant herein, also known as "George Falcone"

1

and as "Michael Safir" ("Malyar") resided in the State of New York and worked at Blue Square Management, Inc.

4.    Defendant KUPERMAN, along with co-conspirator Malyar, ran the day-to-day office operations of Blue Square Management, Inc., and Novosselov, using the name David Markowitz, held himself out as president and a principal officer of Blue Square Management, Inc.

5.    Blue Square Management, Inc. (referred to herein as "Blue Square Management" and "Blue Square"), a New York Corporation that conducted business from various locations in New York, including: 225 Broadway, Suite 1905, New York, NY, 10007; 246 West 38th Street, New York, NY, 10018; 120 Stuyvesant Place, Suite 415, Staten Island, NY, 10301; and 1328 Broadway, Rm 524, New York, NY 10001, and which was previously located on the Internet at www.bluesquaremanagement.com, purported to be a venture capital firm in the business of selling securities and specializing in underwriting initial public offerings; however, at no time material to this Information was Blue Square registered with the Securities and Exchange Commission ("SEC") as an investment company, investment advisor, broker dealer, or in any other capacity, nor was Blue Square registered with the National Association of Securities Dealers ("NASD") in any capacity.

6.    Co-conspirator Novosselov controlled bank accounts at numerous financial institutions, opened in the name of David Markowitz and in the name of Blue Square Management, including accounts at Citibank, JP Morgan Chase ("Chase"), HSBC Bank USA ("HSBC"), Sterling National Bank ("Sterling"), and North Fork Bank, which are engaged in, and the activities of which affect, interstate and foreign commerce.

7.      Cash Money Lending Corp. (referred to herein as "Cash Money Lending Corp." and "CMLC") was a fictitious corporation, purportedly in the business of managing ATM machines that the defendant and his co-conspirators represented to investors to be an actual company, in which the investors could purchase securities.

8.      Defendant KUPERMAN, Malyar, and Novosselov, acting as employees of and representatives of Blue Square Management, working together and with other individuals known and unknown to the United States Attorney, conducted business throughout the United States, in among other places, the State of Connecticut, specifically by placing and participating in telephone calls, mailing correspondence, soliciting investment funds, selling fictitious securities to numerous investor-victims, and receiving funds from the investor-victim-purchasers intended for investment, including investor-victim-purchasers located in the District of Connecticut.

9.      Individual victim-investor-purchasers who are specifically referenced in this Information and whose identities are known to the United States Attorney, are referred to in this Information by their initials as "H.T.C.," and "C.P."

## The Conspiracy

10.     Beginning in or about January 2001, and continuing until in or about March 2004, in the District of Connecticut and elsewhere, the defendant,

DMITRY KUPERMAN,

together with Viktor Novosselov, Igor Malyar, and others, both known and unknown to the United States Attorney, did knowingly combine, conspire, confederate, and agree together and with each other, to commit offenses against the United States as follows:

a.      knowingly to devise and intend to devise a scheme and artifice to defraud and to

3

obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and knowingly, with intent to defraud, cause to be placed in a United States Post Office or other authorized depository for mail matter, items to be sent and delivered by the United States Postal Service according to the directions thereon, and caused to be deposited items to be sent and delivered by private and commercial interstate carriers, for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1341;

b.    to willfully, by use of means and instruments of interstate commerce and by use of the mails, in the offer and sale of securities, (1) employ a device, scheme, and artifice to defraud, (2) obtain money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made not misleading, in light of the circumstances under which they were made, and (3) engage in transactions, practices, and courses of business that operated as a fraud and deceit upon the purchasers of these securities, in violation of 15 U.S.C. §§ 77q(a) and 77x;

c.    to conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activities, that is securities fraud and mail fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, that is securities fraud and mail fraud, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial

4

transaction represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

d.     knowingly to engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 and which was derived from a specified unlawful activity, that is securities fraud and mail fraud, in violation of 18 U.S.C. § 1957.

## Purpose of the Conspiracy

11.     The purpose of the conspiracy was for the defendant and his co-conspirators to enrich themselves by fraudulently obtaining money from numerous investors, including investors in the District of Connecticut, through the sale of securities that were purportedly issued by, or on behalf of, the company CMLC which was purportedly in the business of managing ATM machines and by falsely representing to the investors that the funds they provided had been and would be used to purchase such securities.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish said conspiracy included, among others, the following:

12.     It was a part of the conspiracy that defendant KUPERMAN and his co-conspirators set-up the physical office operations of and conducted the business operations of Blue Square Management – which the defendant and his co-conspirators described as a New York City venture capital firm that raised money for private companies – at a location in Staten Island New York and at locations in New York, New York.

13.     It was a further part of the conspiracy that, in order to create the appearance of

legitimacy, defendant KUPERMAN and his co-conspirators set up and maintained a publicly accessible, multi-page website describing Blue Square's purported venture capital business and investment philosophy. The website portrayed the business in positive but general terms, and did not provide details such as names of clients, officers, directors, or employees. The website contained false and misleading representations, including, but not limited to:

A.      That "[a]s a leading venture capital firm, Blue Square Management has the industry expertise and capital to launch the next wave of great companies;"

B.      That Blue Square has "invested in companies across the board in the technology, finance, medical and e-commerce industries;"

C.      That Blue Square has "over 60 years of combined experience in the financial markets;" and

D.      That "Blue Square Management's Investment Banking Group's seasoned processionals have global experience with the full menu of alternative and/or complementary corporate financial services."

14.     It was a further part of the conspiracy that defendant KUPERMAN using the name Kaufman and his co-conspirators, using the name Markowitz among others, would and did obtain money from investors throughout the United States, including investors in the District of Connecticut, by making unsolicited telephone calls to them (i.e., "cold calling") and falsely and fraudulently representing, among other things, that:

A.      Blue Square was a New York City based venture capital firm that was offering them the opportunity to invest in a private ATM-management company named CMLC;

B.      CMLC operated a lucrative business managing thousands of ATMs across the country;

C.  the initial public offering for CMLC, and/or a buy-out of the company, would occur in the near future and as such the investors who purchased stock pre-IPO and/or pre-buyout would make a significant profit;

D.  in addition to purchasing stock, investors could receive warrants which would also be of significant value; and

E.  investors could purchase CMLC stock for $7 to $10 per share, which was represented to be one-third to one-half the planned IPO or buy-out price,

when in truth and in fact, CMLC was a fictitious entity with no actual operations, did not manage thousands of ATMs across the country, and there was no planned IPO.

15.  It was a further part of the conspiracy that, following the verbal solicitation of investments made during the cold-calls, defendant KUPERMAN and his co-conspirators, in an attempt to lure and entice investors, distributed and caused to be distributed certain promotional materials about CMLC to prospective investors that expanded upon the solicitations and contained false and misleading representations, including, among other things, that:

A.  Blue Square would be an underwriter for Cash Money Lending Corp.;

B.  CMLC began its operations in 1995;

C.  CMLC was an independent ATM management company uniquely positioned to serve a wide range of customers, from financial services companies and chain stores to individual merchants and private investors.

D.  CMLC actively managed over 6,000 ATM machines and is one of the fastest growing companies in the ATM Industry;

E.  CMLC offered a full line of brand-name equipment, "installation & training," and maintenance; and

F.  CMLC used new technology to "push profits to new heights,"

when in truth and in fact, CMLC was a fictitious entity with no actual operations, did not manage

thousands of ATMs across the country, and had no profits.

16.    It was a further part of the conspiracy that, to further create the appearance of legitimacy, after prospective investors expressed an interest in investing, defendant KUPERMAN and his co-conspirators would and did send the investors official looking documents that contained false and misleading representations tending to corroborate the misrepresentations made over the phone.  Such documents included:

A.    Stock Certificates bearing the name Cash Money Lending Corp. that certified that the individuals whose name appeared on the certificate were the owners of shares of "the Corporation," referring to Cash Money Lending Corp.;

B.    Subscription Agreements for the purchase of common stock of Cash Money Lending Corp. and stating, among other things, that the investor is purchasing the shares for his own account with the intention of holding the Shares for investment; and

C.    Invoices, signed on behalf of Blue Square Management under the name David Markowitz, Senior Vice President, and setting forth the number of shares the investor had agreed to purchase, the payments owed, and the estimated opening price,

when in truth and in fact, the stock certificates were bogus, as CMLC was a fictitious entity with no actual operations and, as there was no planned IPO, the "estimated opening price" was also fictitious.

17.    It was further part of the conspiracy that the defendant KUPERMAN and his co-conspirators caused more than 50 investors to send Blue Square "investments" of more than $2.5 million and KUPERMAN, along with Malyar and other members of the conspiracy, would and did collect the "investment" checks, prepare them for deposit into one of the Blue Square

bank accounts, and would and did deposit and cause others to deposit the "investment" checks into one of the Blue Square accounts.

18.    It was further part of the conspiracy that defendant KUPERMAN and his co-conspirators failed to invest the money as represented, but instead diverted investors' funds for their own personal use and benefit, including paying business expenses, making purchases for themselves of dinners and merchandise, and converting large amounts of the funds into cash.

19.    It was further part of the conspiracy that co-conspirator Novesselov, having acquired, directly or indirectly, a Social Security account number in the name of David Markowitz on the basis of false information furnished to the Commissioner of Social Security, would and did use that number to facilitate the diversion of investors' funds by: acquiring a photo identification card in the name of David Markowitz; opening bank accounts using the identification card and fraudulently obtained Social Security account number; and moving investor funds through the above described accounts opened in the name of David Markowitz and Blue Square by electronic funds transfer and by negotiating multiple checks, including checks in amounts greater than $10,000.

20.    It was a further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did engage in monetary transactions in criminally derived property, which was derived from securities fraud and mail fraud, by negotiating checks and executing electronic funds transfers to move the fraudulent proceeds from one account to another.

21.    It was a further part of the conspiracy that defendant KUPERMAN, and his co-

9

conspirators, in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did cash checks made to the order of Blue Square and David Markowitz.

22. It was a further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, in an attempt to conceal the nature and source of funds received by Blue Square from the sale of CMLC stock, would and did use automatic teller machines to obtain cash, generally in blocks of $500.00, from the Blue Square accounts at various banks, the source of funds for the cash withdrawals being the fraudulently obtained proceeds.

23. It was a further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, would and did engage in monetary transactions in criminally derived property of a value greater than $10,000, the source of such funds having been derived from securities fraud and mail fraud, by negotiating checks, depositing checks and executing electronic funds transfers in amounts greater than $10,000.

24. It was further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, diverted and dissipated investors' funds by transferring the monies to multiple accounts by way of check and funds transfers and then withdrawing cash from those accounts by way of checks made payable to Markowitz and to "Cash" and cashing the checks, and withdrawing cash from those accounts by executing multiple ATM withdrawals.

25. It was a further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, after having concealed and disguised the nature, location, source, ownership, and control of funds obtained by Blue Square from investors in CMLC, would and did fail to invest the money as had been represented, but instead diverted and caused to be diverted investors'

funds for the personal use and benefit of members of the conspiracy, including converting large amounts of the funds into cash to be distributed to members of the conspiracy.

26.    It was further part of the conspiracy that defendant KUPERMAN, and his co-conspirators, would and did lull investors into believing that their investment funds had been invested into the CMLC securities, as represented, and would and did prevent the discovery of the true use of investors' funds by the investors by, among other ways:

A.    issuing monthly account statements to investors that purported to show the investor's account activity and balance at Blue Square, including apparent increases in the value of the CMLC investment;

B.    stating to investors that CMLC had a large amount of debt that was previously unknown that would delay the IPO;

C.    stating to investors that lawyers were still working on the deal and it would take time to work out the details; and

D.    stating to investors that there were additional shares that needed to be sold and redistributed before the deal could go forward.

Overt Acts

In furtherance of the conspiracy and to effect the objects of the conspiracy, defendant KUPERMAN,  together with Novosselov, Malyar, and other co-conspirators committed and caused to be committed the following overt acts, among others, in the District of Connecticut and elsewhere:

27.    In or about January 2001, defendant KUPERMAN and his co-conspirators Novesslov and Malyar met at an apartment located at 2944 West 5th Street in Brooklyn New York and discussed, among other things, the above described scheme for enriching themselves by fraudulently obtaining money from investors.

11

28.     In or about the spring of 2001, defendant KUPERMAN and his co-conspirator Malyar met with another co-conspirator at a bar called H-2-0 located in Bay Ridge Brooklyn, New York, and discussed, among other things, the above described scheme for enriching themselves by fraudulently obtaining money from investors and locating other individuals with knowledge of the securities business to join the conspiracy.

29.     On or about October 22, 2001, co-conspirator Novosselov, using the name David Markowitz, opened a business checking bank account in the name of Blue Square Management Inc., at a branch of Chase in New York City.

30.     In or about December 2001, defendant KUPERMAN met with co-conspirator Novosselov, received cash from Novosselov that had been sent to Blue Square accounts from investor-victims, and thereafter distributed the cash to other members of the conspiracy.

31.     In or about October 2002, defendant KUPERMAN met with co-conspirator Novosselov, received cash from Novosselov that had been sent to Blue Square accounts from investor-victims, and thereafter distributed the cash to other members of the conspiracy.

32.     In or about November 2002, defendant KUPERMAN, Novesslov and a number of their co-conspirators met with investor C.P. at a dinner meeting in New York City and falsely represented to him, among other things, that Blue Square was in the business of selling securities, that CMLC was an actual company the stock of which Blue Square was selling, and that the funds of investor CP would go to the purchase of such stock; at this meeting, defendant KUPERMAN falsely held himself out as a satisfied client of and investor with Blue Square.

33.     On or about March 28, 2003, defendant KUPERMAN and his co-conspirators caused investor H.T.C. of Greenwich, Connecticut, to send Check #308 in amount of $140,000

to Blue Square at 225 Broadway Ste. 1905, New York, NY.

34.    On or about April 2, 2003, defendant KUPERMAN and his co-conspirators transferred and caused to be transferred $20,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account # 383778101 at Sterling National Bank by depositing check #1236 drawn on JP Morgan Chase account into the Sterling National Bank account.

35.    On or about April 2, 2003, defendant KUPERMAN and his co-conspirators transferred and caused to be transferred $21,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account # 007895372 at HSBC Bank USA by depositing check #1237 drawn on JP Morgan Chase account into the HSBC Bank USA account.

36.    On or about April 3, 2003, defendant KUPERMAN and his co-conspirators transferred and caused to be transferred $20,000 by check from Blue Square acct. # 668503520665 at JP Morgan Chase to the Blue Square account #7024069499 at the North Fork Bank by depositing check #1235 drawn on JP Morgan Chase account into the North Fork Bank account.

All in violation of Title 18, United States Code, Section 371.

### COUNT TWO
**(15 U.S.C. §§ 77q(a), 77x and 18 U.S.C. § 2)**
**Securities Fraud**

37.    The allegations contained in paragraphs 1-9 and 11-36 of Count 1 are realleged and incorporated by reference as though fully set forth herein as describing a device, scheme and

artifice to defraud and to obtain money and property by means of untrue statements of material facts and omissions necessary to make the statements made not misleading in light of the circumstances under which they were made, and to engage in a transaction, practice, and course of business which would operate as a fraud and deceit upon the victim-investor-purchasers.

38.    As offered by the defendant and his co-schemers to investors, the CMLC stock identified in Paragraphs 14 - 17 of Count 1 were securities within the meaning of the federal securities laws.

39.    It was part of the fraudulent scheme that defendant DMITRY KUPERMAN and others known and unknown to the United States Attorney, caused Blue Square to offer the aforesaid securities to victim-investors through a scheme in which the defendant and others falsely described the securities as shares of CMLC purportedly a company that managed thousands of ATMs and which would have an initial public offering and/or a buy-out in the near future and as such investors would make a significant profit.

40.    On or about March 28, 2003, as listed below, for the purpose of executing the aforesaid device, scheme, and artifice to defraud, and to obtain money and property by means of untrue statements of material facts and omissions necessary to make the statements made not misleading, in light of the circumstances under which they were made, and to engage in a transaction, practice, and course of business which would operate as a fraud and deceit upon the victim-investor-purchasers, and attempting to do so, the defendant,

DMITRY KUPERMAN,

did knowingly and willfully cause to be used the mails and certain means and instruments of communication in interstate and foreign commerce, directly and indirectly, in the offer and sale

14

of securities in the form of shares in Cash Money Lending Corp., to victim-investor-purchaser

H.T.C. as follows:

| Count | Date | Mailing/Means and Instruments of Interstate Commerce |
|-------|------|------------------------------------------------------|
| 2 | 3/28/03 | Check #308 in the amount of $140,000 from investor H.T.C. of Greenwich, Connecticut, sent by means and instruments of interstate commerce to Blue Square Management at 225 Broadway Suite 1905, New York, NY 10007 |

All in violation of Title 15, United States Code, Sections 77q(a) and 77x, and Title 18,

United States Code, Section 2.

FORFEITURE ALLEGATION UNDER 28 U.S.C. § 2461(c) & 18 U.S.C. 981(a)

(Conspiracy to Commit Fraud)

Upon conviction of conspiracy to commit mail fraud as charged in Count One of this Information, defendant KUPERMAN shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of mail fraud conspiracy, 18 U.S.C. §§ 371 and 1341, including but not limited to the following:

Money Judgment:

A sum of money equal to $3,700,000 in United States currency, in that such sum in aggregate is property which constitutes or is derived from proceeds traceable to the mail fraud conspiracy, 18 U.S.C. § 371, as alleged in Count One, namely, conspiracy to violate 18 U.S.C. § 1341.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

All in accordance with 18 U.S.C. § 981(a)(1) as incorporated by 28 U.S.C. § 2461(c), and

Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

 /s/
KEVIN J. O' CONNOR
UNITED STATES ATTORNEY

/s/
ANTHONY E. KAPLAN
SUPERVISORY ASSISTANT
UNITED STATES ATTORNEY

/s/
MICHAEL S.  McGARRY
ASSISTANT UNITED STATES ATTORNEY